UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK A. ANTHONY,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Case No. 2:21-cv-10778
District Judge Victoria A. Roberts
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a social security case.  Plaintiff Mark A. Anthony brings this action

under 42 U.S.C. § 405(g), challenging the final decision of Defendant

Commissioner of Social Security (Commissioner) denying his application for

Social Security Income (SSI) under the Social Security Act (the Act).  This is the

second time the Commissioner has denied Anthony's application for SSI.  As will

be explained, the first denial led to a successful appeal in this Court in which the

district court, adopting the Report and Recommendation of the magistrate judge,

remanded Anthony's case for a new hearing.

1

Following the new hearing, Anthony's application for SSI was once again denied leading to this appeal. Both Anthony and the Commissioner have now filed summary judgment motions, (ECF Nos. 17, 20), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ's) conclusion that Anthony is not disabled under the Act. Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 20) be GRANTED, Anthony's Motion for Summary Judgment (ECF No. 17) be DENIED, and that the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

Anthony was 46 years old at the time of his alleged onset date of January 1, 2013. (ECF No. 12, PageID.88). He previously worked as a painter. (*Id*., PageID.99). Anthony alleged disability due to brain damage, lower back pain, left shoulder pain, abdominal pain, and a learning disability. (*Id*., PageID.88).

After Anthony's application was denied at the initial level on August 20, 2015, (*Id*., PageID.100-101), he timely requested an administrative hearing, which was held on March 16, 2017, before the ALJ. (*Id*., PageID.105-116). Anthony testified at the hearing, as did a vocational expert (VE). (*Id*., PageID.105).

2

On June 7, 2017, the ALJ issued a written decision finding that Anthony was not disabled.  (*Id.*, PageID.105-116).  On March 5, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.49-53).  Anthony filed for judicial review of the final decision.  The magistrate judge issued a Report and Recommendation recommending granting Anthony's motion for summary judgment and remanding the case for reconsideration of the opinion evidence, consideration of whether Anthony's mental impairments met or equaled Listing 12.11, and to obtain testimony from a medical expert.  (*Id.*, PageID.564-580).  The district court adopted the Report and Recommendation over the Commissioner's objections and remanded the case. (*Id.*, PageID.553-563).

On remand, the Appeals Council ordered the ALJ to hold a new hearing and to consolidate the remanded case with a new claim for benefits that Anthony filed on March 26, 2018.  (*Id.*, PageID.473).  The new hearing was held telephonically on June 30, 2020, and Anthony, an impartial medical expert in psychology (Amy Hamilton, Ph.D.), and a VE all testified.  (*Id.*, PageID.504-534).

Anthony offered the following testimony at the hearing.

He sometimes stayed with a friend and at other times stayed with his girlfriend.  (*Id.*, PageID.519).  Anthony spent his time watching television and doing chores at his girlfriend's house like mowing the lawn, washing dishes, and

3

dusting.  (*Id*., PageID.524).  Because of his depression, he only showered once each week.  (*Id*.).  He did not cook but did sometimes heat up food in the microwave.  (*Id*., PageID.525).  Anthony struggled with sleeping due to racing thoughts.  (*Id*.).  He typically slept for four hours each night and required trazodone to help him sleep.  (*Id*.).

He believed that his condition had worsened since his last hearing.  (*Id*., PageID.521-522).  He had issues with his back that made it difficult for him to bend over and caused him pain.  (*Id*., PageID.522).  He struggled with standing more than 15 minutes and walking more than three blocks.  (*Id*., PageID.522-523).  He thought that he could lift approximately 15 pounds.  (*Id*., PageID.523).

On July 22, 2020, the ALJ issued a written decision finding that Anthony was not disabled.  (*Id*., PageID.473-496).  On February 4, 2021, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.463-468).  Anthony timely filed for judicial review of the final decision.  (ECF No. 1).

B.    Medical Evidence[1]

The issues on appeals all concern the ALJ's consideration of the following opinions regarding Anthony's mental health.

---

[1] The medical evidence section of this Report and Recommendation only includes information about Anthony's mental health because he does not raise any issues related to his physical health on appeal.

4

1.    L. Imasa, M.D.

Dr. Imasa evaluated Anthony on July 28, 2015, and provided a psychiatric report for the SSA.  (ECF No. 12, PageID.310-312).  Anthony reported that he was diagnosed with a learning disability as a child and was teased as a child for a stutter and difficulty communicating.  (*Id.*, PageID.310).  He further reported that he usually felt " 'down,' " tended to isolate himself, had a low energy level, had crying spells, angered easily leading to verbal and physical aggression, and had difficulties sleeping.  (*Id.*).  He also stated that he suffered from paranoia, was easily distracted, and suffered from anxiety.  (*Id.*).  Anthony was prescribed Paxil and Tramadol.  (*Id.*).  He was not presently seeing either a psychiatrist or a therapist.  (*Id.*).

Dr. Imasa observed that Anthony's "[h]ygeine and grooming appear[ed] to be adequate."  (*Id.*, PageID.311).  She furthered observed that he appeared nervous.  (*Id.*).  Overall, Dr. Imasa opined that Anthony was "not able to function on a fully sustained basis."  (*Id.*, PageID.312).

2.    Rom Kriauciunas, Ph.D.

Dr. Kriauciunas evaluated Anthony's application for benefits on August 20, 2015.  (ECF No. 12, PageID.93-99).  Anthony's relevant impairments included drugs (substance addiction disorders), learning disorder, and affective disorders. (*Id.*, PageID.93).  Dr. Kriauciunas considered Listing 12.02 (Organic Mental

Disorders), Listing 12.04 (Affective Disorders), and Listing 12.09 (Substance

Addiction Disorders.  (*Id.*).  Notably, Dr. Kriauciunas found the following:

> **Restriction of Activities of Daily Living:** Mild
> **Difficulties in Maintaining Social Functioning:** Moderate
> **Difficulties in Maintaining Concentration, Persistence or Pace:** Moderate
> **Repeated Episodes of Decompensation, Each of Extended Duration:** None

(*Id.*) (emphasis in original).  Ultimately, Dr. Kriauciunas opined: "Mental

impairments do not significantly limit [Anthony's] ability to perform simple, low-

stress, unskilled work on a sustained basis.  This is based on findings of fact and

analysis of available evidence."  (*Id.*, PageID.99).

### 3.    Darren Fuerst, Ph.D.

Dr. Fuerst evaluated Anthony for a possible learning disability on January

19, 2016.  (ECF No. 12, PageID.321-325).  Anthony reported that he struggled to

learn to read and write, and that around fourth grade he was placed in special

education for the remainder of his schooling.  (*Id.*, PageID.321).  He further

reported that he had last worked three or four years prior as a painter.  (*Id.*).  At the

present, he was homeless and staying with friends.  (*Id.*).  In regard to his

psychiatric history, Anthony reported that he had experienced multiple depressive

episodes and been hospitalized on multiple occasions for suicidal thoughts.  (*Id.*,

PageID.322).  He denied treating with a psychiatrist outside of a hospital setting.

(*Id.*).  As of the date of the evaluation, Anthony had been clean for approximately

1.5 years following a 15-to-20-year addiction to crack/cocaine.  (*Id.*).

Dr. Fuerst observed that Anthony's grooming and dress were appropriate,

and that his "[s]peed, coordination, gait, balance, and posture appeared normal."

(*Id.*, PageID.322).  Anthony's speech and articulation as well as eye contact were

all normal.  (*Id.*).  Dr. Fuerst administered 12 separate tests.  (*Id.*, PageID.322-

323).  Anthony's full-scale IQ was 80, which was in "the low average range."  (*Id.*,

PageID.323).  Notably, other results indicated that Anthony had a "verbal learning

disability" as well as ADHD.  (*Id.*, PageID.323-325).  It was also noted that

"[p]ersonality testing revealed problems with depression and anxiety."  (*Id.*,

PageID.325).  Ultimately, Dr. Fuerst's recommendations were as follows:

> 1.     Testing indicates the presence of ADHD and a learning disability with related cognitive deficits in the context of low average IQ. Treatment of ADHD and LD will have questionable and limited benefits, respectively.  He should apply for Social Security disability.
> 2.     Treat his depression and anxiety with pharmacotherapy, most probably an SSRI, and psychotherapy.
> 3.     He should be evaluated and if necessary treated for his hypertension.

(*Id.*, PageID.325).

### 4.     Hugh D. Bray, PhD.

Dr. Bray evaluated Anthony on August 14, 2018.  (ECF No. 12,

PageID.942).  Anthony reported a history of depression, ADHD, and OCD.  (*Id.*,

PageID.942-943).  He further reported that he had been seeing a mental health

provider for approximately 3.5 years and denied ever receiving inpatient mental health treatment. (*Id*., PageID.942). Anthony stated that he was unable to work because of pain caused by his back and rotary cuff. (*Id*., PageID.943). He was fired from his previous job as a painter because he stopped showing up to work due to his depression. (*Id*.). Anthony slept for approximately four hours each night and struggled to sleep because his mind raced. (*Id*., PageID.944). He last used crack 4.5 years prior and cocaine 10 years prior. (*Id*.). Anthony had a history of inpatient substance abuse treatment and incarceration. (*Id*.). Anthony was prescribed the following medications: Adderall, Abilify, Tramadol, Seroquel, and Flexeril. (*Id*., PageID.948).

Dr. Bray observed that Anthony's "[g]rooming and hygiene were adequate," and "[p]osture and gait were within normal limits." (*Id*., PageID.944). His "[m]otor activity [was] slowed" and "[n]ot consistent with ADHD." (*Id*.). Dr. Bray further observed that Anthony had diminished self-esteem. (*Id*.). Further, Anthony was "talkative, thoughts [were] organized and goal directed" and his "speech [was] clear, understandable, and expressive." (*Id*., PageID.945). Dr. Bray did not observe a stutter. (*Id*.). Overall, Dr. Bray rated Anthony's prognosis as fair and indicated that Anthony needed mental health treatment and to continue use of prescribed psychotropic medications. (*Id*., PageID.946). Dr. Bray provided the following discussion of the four work-related mental activities:

8

1.     The claimant's mental ability to relate to others, including fellow workers and supervisors, is MILDLY to MODERATELY impaired.  In interacting with the examiner today, the client WAS able to form a rapport with the examiner.

2.     Today the claimant's mental ability to understand, remember and carry out tasks appears to be MODERATELY impaired.  In interacting with the examiner today, the client WAS able to perform simple repetitive tasks.  It is likely the claimant COULD handle more complex tasks.  Difficulty in performing multiple step tasks is likely to be MODERATELY impaired.

3.     The claimant's mental ability to maintain attention, concentration, persistence, pace and effort is MODERATELY impaired.

4.     As a result of the interview today it was assessed that the claimant's mental ability to withstand pressure associated with day to day part time work activities is MODERATELY impaired.  The claimant's mental ability to withstand stress and pressure associated with day to day full time work activities is MODERATELY impaired.

(*Id.*, PageID.946).

### 5.     Juana Gasso, PA-C

Gasso completed a mental residual functional capacity questionnaire for

Anthony in March of 2019.[2]  (ECF No. 12, PageID.1045-1048).  She stated that

Anthony was diagnosed with major depression, ADHD, and dorsalgia (back pain).

(*Id.*, PageID.1045).  Anthony received monthly outpatient services and he had

made "some progress," but continued to have "some pain [and] difficulty

---

[2] The majority of the questionnaire required Gasso to check boxes if a statement applied to Anthony, rather than requiring her to provide narrative answers.

understanding some tasks [and] concepts." (*Id*.).  He was prescribed Abilify (mood stabilizer), Adderall (ADHD), Seroquel, and Flexeril.  (*Id*.).  She rated his prognosis as fair, and explained that Anthony made careless mistakes, struggled to keep on task, got distracted, had difficulty understanding, suffered from memory loss and racing thoughts, had difficulty sitting still, and had a severely depressed mood, stuttering speech, and anxiety.  (*Id*.).  Gasso also noted that Anthony "gets angry with others."  (*Id*., PageID.1047).  Overall, Gasso estimated that Anthony would miss work more than four days each month.  (*Id*., PageID.1048).

### 6.      Amy Hamilton, Ph.D. (Medical Expert)

Dr. Hamilton testified at the hearing after reviewing Anthony's file.  (ECF No. 12, PageID.511-512).  She opined that Anthony had persistent depressive disorder with anxious distress, ADHD, and a learning disorder.  (*Id*., PageID.512).  She further opined that Anthony met Listing 12.04 (depressive disorders) and Listing 12.11 (neurodevelopmental disorders).  (*Id*.).  Dr. Hamilton rated Anthony's ability to understand, remember, and apply as moderate.  (*Id*., PageID.513).  She rated as marked Anthony's ability to interact with others, his ability to concentrate, persist, or maintain pace, and his ability to withstand pressures at work.  (*Id*., PageID.514-515).

10

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, SSI is available only for those who have a

"disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act

defines "disability" as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The

Commissioner's regulations provide that a disability is to be determined through

the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the

11

claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Anthony was not disabled under the Act. At Step One, the ALJ found that Anthony had not engaged in substantial gainful activity since March 23, 2015 (application date). (ECF No. 12, PageID.475). At Step Two, the ALJ found that he had the severe impairments of learning disorder, ADHD, degenerative disc disease of the lumbar spine, osteoarthritis, and depression. (*Id.*, PageID.476). At Step Three, the ALJ found that none of Anthony's impairments met or medically equaled a listed impairment. (*Id.*, PageID.476). The ALJ considered both Listing 12.04 (depressive disorders) and Listing 12.11 (neurodevelopmental disorders). (*Id.*).

The ALJ then assessed Anthony's RFC, concluding that he was capable of performing

> light work as defined in 20 CFR 416.967(b) except: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally perform overhead reaching, pushing, and pulling with the left upper extremity; must be allowed to alternate between sitting and standing, but would not be off task more that 10% of the day.  He would need to sit about every 20 minutes.  He can understand, remember, and apply simple instructions; concentration, persist and remain on pace while doing simple, routine, repetitive tasks.  He would be limited to low-stress work, meaning only simple, work-related decisions, little to no change in work setting routine, and no fast-paced production work.  He would be limited to occasional interaction with the public.

(*Id.*, PageID.485).

At Step Four, the ALJ found that Anthony could perform no past relevant work.  (*Id.*, PageID.494).  At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Anthony was capable of performing the jobs of garment sorter (200,439 jobs nationally), price marker (256,156), and routing clerk (218,501).  (*Id.*, PageID.495).  As a result, the ALJ concluded that Anthony was not disabled under the Act.  (*Id.*, PageID.496).

## IV.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal

13

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks

omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . .

. presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

V.    Analysis

The central issue in this case is whether substantial evidence supports the ALJ's finding that Anthony's mental impairments did not satisfy Listing 12.11. Anthony argues that substantial evidence does not support the ALJ's finding because she erred in evaluating the relevant opinion evidence as well as in

15

evaluating Anthony's subjective symptoms. The Commissioner, however, argues that the ALJ made no such errors and that her finding regarding Listing 12.11 is supported by substantial evidence.

A.    Listing 12.11 and Opinion Evidence

To satisfy Listing 12.11, Anthony needed to show an "extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning: [1] understand, remember or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself." 20 C.F.R. Pt. 404, Supt. P, App'x 1 §§ 12.04(B), 12.11(B).

On remand, the ALJ explicitly considered Listing 12.11 and found a moderate limitation in all four categories. (ECF No. 12, PageID.481-485). She analyzed each of the four elements and provided rationale for her analysis. *See Ledford v. Comm'r of Soc. Sec.*, No. 20-CV-12719, 2021 WL 8013979, at *9 (E.D. Mich. Aug. 30, 2021), *report and recommendation adopted*, 2022 WL 866405 (Mar. 23, 2022) ("The ALJ analyzed each element, individually, and cited to the record several times for each element to support his position."). The ALJ's detailed analysis bears repeating because it shows that she carefully considered the record and followed the remand instructions. The ALJ explained:

> In understanding, remembering or applying information, the claimant has a **moderate** limitation. As discussed above, the claimant exhibited moderate impairments on memory tests in 2015 and 2018 (Exhibits 5F, 18F). Memory tests administered by Dr. Fuerst revealed mild to

16

moderate limits in immediate memory, and average to mildly impaired functioning in delayed memory (Exhibit 7F/3-4). Treatment records reflect complaints of memory impairment. However, Dr. Chapman and Gasso did not report signs of impairment in this area, such as difficulty with recalling medical history, providing information for his care, or understanding treatment recommendations.

Dr. Fuerst opined that the claimant had severe limitation (cannot function in this area) in the ability to understand and remember detailed instructions (Exhibit 10F/1). The undersigned afforded little weight to this opinion because it is inconsistent with the majority of evidence. In his own report, Dr. Feurst [sic] reported that on memory tests, the claimant's performance indicated mild to moderate impairment in immediate memory, but average to mildly impaired in delayed memory (Exhibit 7F/4). Dr. Feurst [sic] also reported, "Instructions typically did not need rephrasing or repetition," which indicates that the claimant was able to understand testing instructions without difficulty (Exhibit 7F/2). As discussed above, treating sources, included Dr. Fuerst, did not report significant deficits in this area. Dr. Fuerst completed a check box evaluation with no explanation, which is inconsistent with only finding mild-moderate deficiencies on his exam. Moreover, claimant worked many years as a painter, a skilled job, before his physical impairments prevented him from returned to that occupation.

In interacting with others, the claimant has a **moderate** limitation. As discussed above, Dr. Chapman and Gasso consistently described the claimant as pleasant and cooperative at appointments from 2016-2020 (Exhibits 8F/37, 22, 16, 9, 5; 17F/122, 113, 66, 39, 35, 28; 21F/36, 27; Exhibits 26F/18; 26F/7, 14, 34, 60, 67, 87, 94, 101; 28F/12, 36, 43, 47). Both treating sources and multiple therapists reported observing anxiety and depressed mood in the claimant at several appointments. However, none of these treating sources reported unusual, defiant, uncooperative, or aggressive behavior in the claimant during this period. Consultative psychological examiners also observed anxious mood but cooperative behavior in the claimant (Exhibits 5F, 18F). Although the claimant reported problems with stuttering, most treating and examining sources reported that the claimant's speech was normal

and understandable (Exhibits 5F/3; 7F/2-3; 8F/80, 37, 5; 17F/122, 39, 28; 18F/4; 21F/27; 26F/7, 60, 101; 28F/12, 47).

Medical expert Dr. Hamilton testified that the claimant had marked limitation in this domain.  The undersigned afforded little weight to this opinion because it is inconsistent with the majority of evidence, including the treating and examining source observations discussed above.  In support of her opinion, Dr. Hamilton testified that the claimant could be "verbally and physically aggressive with people" (Transcript).  Dr. Hamilton appears to be referring to Dr. Imsa's [sic] 2015 [evaluation], where the claimant told the examiner that he "gets angry easily, gets verbally and physically aggressive" (Exhibit 5F/2).  However, as discussed above, treating sources and examining sources consistently observed cooperative, pleasant, and appropriate behavior in the claimant for nearly four years.

Dr. Hamilton also opined that that the claimant's functioning in this domain was marked because his learning deficits, borderline intelligence, impaired concentration, and depression symptoms would make it easier for coworkers and members of the public to take advantage of the claimant.  Again, this opinion is not supported by the evidence.  Although treating and examining sources noted moderate limits in the claimant's memory and concentration, they also reported that his thought processes were logical and goal oriented (Exhibits 8F, 21F, 26F, 28F).  In 2018, the claimant told a consultative psychological examiner that he had a good work relationship with supervisors and peers (Exhibit 18F/2).  Claimant's cognitive abilities have not changed since childhood, and he worked for many years at substantial levels.  No evidence exists to support claimant was taken advantage of during this time.  Dr. Hamilton's supposition is not consistent with the available evidence.  Overall, the medical evidence of record does not demonstrate marked limits in the claimant's ability to perform and tolerate interactions with others.

Private examiner Dr. Fuerst opined that the claimant had marked and severe limits (i.e., little and no ability to function) in his ability to work in proximity to coworkers, supervisors, and the public; interact appropriately with the public; understand instructions and respond appropriately to criticism from supervisors (Exhibit 10F/1-2).  The undersigned afforded this opinion little weight because it is inconsistent

with the majority of evidence.  Dr. Feurst [sic] established rapport with the claimant, and observed normal speech and behavior during testing (Exhibit 7F/2).  As discussed above, mental health care providers consistently described the claimant as pleasant and cooperative, and no treating source reported significant limits in behavior or communication.  Per hearing testimony, the claimant is able to live with others, shop infrequently for necessities, and drive.  Dr. Fuerst's checkbox evaluation does not explain how he arrived at this conclusion, and nothing in his exam of the claimant supports such a conclusion.

With regard to concentrating, persisting or maintaining pace, the claimant has a **moderate** limitation.  Treatment records confirm the claimant's diagnosis with ADHD and treatment with Adderall during the period of alleged disability.  The claimant appeared restless at a consultative exam in 2015 and a private exam in 2016 (Exhibits 5F/3; In 2018, the claimant could not perform serial 7s or spell 'world' backwards on a consultative exam, which indicates limits in concentration (Exhibit 18F).  However, no treating or examining source reported observations of distractibility or inattentiveness in the claimant, or reported needing to redirect the claimant to the task or conversation at hand.  When the claimant established mental health care in 2016, treating sources noted that the claimant fidgeted, but attributed this to the claimant's back pain (Exhibit 8F/81; see also 9F/15).  As discussed above, Dr. Chapman and Gasso consistently reported that the claimant exhibited normal psychomotor activity at appointments. Dr. Fuerst reported that the claimant did not need instructions to be rephrased or repeated (Exhibit 7F/2).  Dr. Bray reported that the claimant exhibited psychomotor slowing, which appeared inconsistent with ADHD (Exhibit 18F/2).

Medical expert Dr. Hamilton opined that the claimant's functioning in this domain was markedly limited, and that the combination of ADHD and depressive symptoms would prevent the claimant from concentrating and remaining on tasks (transcript).  The undersigned afforded little weight to this opinion because it is inconsistent with the aforementioned observations of mental health care providers who treated the claimant for four years in a row.  It also appears inconsistent with the observations of Drs. Imsa [sic], Bray, and Fuerst (per his

exam). As noted above, claimant noted significantly improved concentration and focus while on Adderall.

Dr. Fuerst opined that the claimant had little to no functioning in his ability to complete a workday/week without interruptions; perform at a consistent pace with standard breaks; sustain an ordinary routine without special supervision, and maintain inattention and concentration for extended periods of time (Exhibit 10F/1-2). The undersigned afforded this opinion little weight because it is inconsistent with Dr. Fuerst's own examination records. Dr. Fuerst noted that the claimant's performance on psychometric tests was consistent with ADHD, but also reported that the claimant did not need to have instructions rephrased or repeated, and put forth adequate motivation and effort on testing (Exhibit 7F). Dr. Fuert [sic] noted claimant obtained a mild-moderately impaired simple attention score, and global range of functioning in the low average range (Ex. 7F). As noted above, no other treating or examining source observed inattentiveness, distractibility, or needing redirection at encounters either. Moreover, claimant worked many years as a painter, a skilled job, before his physical impairments prevented him from returned to that occupation.

<u>As for adapting or managing oneself, the claimant has experienced a **moderate** limitation.</u> As discussed above, Dr. Chapman and Grasso [sic] reported anxious and depressed mood in the claimant at some encounters, but more often described him as having normal mood and affect. Therapists reported observations of depression and anxiety more often, but did not report acute limitations in mood or stability. As discussed above, mental health treating and examining sources consistently described the claimant's grooming and hygiene as good (Exhibits 5F/3; 7F/2-3; 8F/80, 37, 5; 17F/122, 39, 28; 18F/4; 21F/27; 26F/7, 60, 101; 28F/12, 47). The claimant consistently denied hallucinations, and no medical source reported signs of psychosis in the claimant (e.g. responding to internal stimuli, disorientation, catatonia).

In 2016, Dr. Fuerst wrote, "(The claimant) has been hospitalized multiple times for suicidal thoughts" and "has never seen a psychiatrist or psychologist outside of a hospital setting" (Exhibit 7F/2). However, in 2018, consultative psychological examiner Dr. Bray wrote that the claimant denied receiving any inpatient mental health treatment (Exhibit 18F/1). Regardless, the treatment evidence does not

demonstrate inpatient mental health care, suicide attempts, or other self-harming/dangerous behavior during the period under consideration.

The claimant was homeless for part of the period under consideration, staying with friends or in his truck (Exhibit 18F). The claimant testified he currently received mail at his girlfriend's house and stayed there occasionally, but otherwise stayed with various friends. He testified that when he stayed with his girlfriend, he did the dishes, dusted, did his own laundry, and cut the grass. The claimant testified he only showered once a week because he was depressed. He stated he did not cook but could make simple foods in the microwave.

Dr. Hamilton opined that the claimant's functioning in this domain was marked because he responded to depression with suicidal ideation, and that the suicidal thoughts elevated his limitation in this domain to marked. The undersigned afforded little weight to this opinion because it is inconsistent with the treatment evidence of record. As discussed above, the claimant told treating sources that he had experienced suicidal thoughts a few times a month since high school (Exhibit 8F/81). However, Dr. Chapman and Gasso consistently wrote that the claimant denied suicidal ideation, and did not exhibit signs of suicidal ideation during nearly four years of appointments (Exhibits 8F, 17F, 21F, 26F, 28F). No treating or examining sources reported signs of psychosis, malnutrition, poor grooming/hygiene, or other acute limits in this domain.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(*Id*., PageID.481-485) (emphasis in original).

After reviewing the ALJ's detailed analysis of the four areas of mental functioning, it is clear to the undersigned that the ALJ properly evaluated the opinion evidence in this case. For claims like Anthony's that were filed before March 27, 2017, medical opinions are evaluated under the old rules found at 20

C.F.R. § 416.927.  Those rules require an ALJ to consider such factors as whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 416.927(c).  As demonstrated by her above analysis, the ALJ focused on the factors set forth in *Wilson*.

Anthony argues that the ALJ should have given more weight to Dr. Fuerst's opinion because this Court previously found that Dr. Fuerst's examining opinion was better supported and more consistent with the record than Dr. Kriauciunas' non-examining opinion.  (ECF No. 17, PageID.1307-1308 (citing *Anthony v. Comm'r of Soc. Sec*., No. 18-cv-11717, 2019 WL 3941258, at *3 (E.D. Mich. June 18, 2019), *report and recommendation adopted*, 2019 WL 3296996 (E.D. Mich. July 23, 2019)).

However, as the Commissioner notes, a great deal of evidence was added to the record after Anthony's first appeal, including: (1) three years of mental health treatment notes (from March 2017 to May 2020) reflecting largely normal findings, (ECF No. 12, PageID.812-941, 965-1044, 1088-1189, 1215-1262); (2) an examining opinion from Dr. Bray, (*Id.*, PageID.942–947); and (3) evidence that

Anthony's concentration improved with medication, (*Id*., PageID.330, 839, 846, 850, 877, 886, 933, 940).

Anthony also faults the ALJ for not affording greater weight to Dr. Hamilton's opinion. However, as the ALJ explained, Dr. Hamilton provided her opinion without examining Anthony and her findings were inconsistent with other opinions and medical evidence. For example, no medical records supported Dr. Hamilton's conclusion that Anthony was physically aggressive. (*Id*., PageID.515). The only mention of aggression in the record comes from Anthony telling Dr. Imasa that he got aggressive. (*Id*., PageID.310). The ALJ accurately noted that "treating sources and examining sources consistently observed cooperative, pleasant, and appropriate behavior in the claimant for nearly four years." (*Id*., PageID.482 (citing *Id*., PageID.330, 334, 341, 347, 362, 835, 839, 846, 850, 855, 877, 886, 924, 933, 940, 976, 981, 986, 999, 1004, 1011, 1017, 1041, 1094, 1101, 1117, 1121, 1147, 1154, 1158, 1174, 1181, 1188, 1226, 1250, 1257, 1261)).

The ALJ afforded the most weight to Dr. Bray's opinion because it was better supported and more consistent with other evidence than the opinions from Dr. Hamilton and Ms. Gasso. (*Id*., PageID.490-493). *See* 20 C.F.R. § 416.927(c)(3), (c)(4)). And unlike Dr. Hamilton, Dr. Bray examined Anthony. *See id*. § 416.927(c)(1). Dr. Fuerst's 2016 opinion was not inconsistent with Dr. Bray's 2018 opinion. Instead, it was based on Dr. Fuerst's assumption at that time

23

that Anthony could not take medication for ADHD due to his history of addiction. (*Id.*, PageID.325).  However, when Dr. Bray examined Anthony two years later, he was being successfully treated with Adderall.  (*Id.*, PageID.946).  In fact, Dr. Bray noted that Anthony's medications were "working well."  (*Id.*, PageID.946).

Ultimately, Anthony disagrees with the weight the ALJ assigned to the various opinions in the record.  However, "[t]he ALJ has the responsibility to weigh the medical evidence if conflicting medical opinions have been presented." *Lane v. Sec'y of Health & Hum. Servs.*, 895 F.2d 1413 (6th Cir. 1990). Additionally, "[a]rguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."  *Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017).

The undersigned declines to reweigh the opinion evidence that has already been considered and weighed by the ALJ, not only because the undersigned is

"forbidden" from doing so, but also because she finds that the weights assigned to the various opinions are supported by substantial evidence.

In sum, the undersigned finds no error requiring a remand in regard to the ALJ's assessment of Listing 12.11 and the evaluation of the opinion evidence.

In addition to his disagreement with the ALJ's evaluation of the opinion evidence, Anthony also disputes the ALJ's characterization of his prior work history as a painter as substantial. But, as the Commissioner highlights, if an individual has earnings above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in substantial gainful activity. 20 C.F.R. §§ 416.974 and 416.975. Here, Anthony's earnings exceeded the regulatory thresholds in 2000, 2001, 2002, and 2003. (*Id.*, PageID.732). His most recent earnings—$11,067.50 in 2012—were only about $1000 under the regulatory threshold. (*Id.*). This evidence demonstrates that Anthony did have some substantial work history, albeit a relatively long time before the ALJ's 2020 decision. Accordingly, the undersigned does not find any error with the ALJ's characterization of Anthony's work history.

### B.    Subjective Symptoms

Under the Social Security Regulations (SSR), the ALJ was required to follow a two-step process when evaluating Anthony's subjective symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16,

2016).  Under SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p.  This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' . . . to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged subjective symptom, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of the symptom; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve the symptom; and (7) other factors concerning functional limitations.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

At the hearing, Anthony testified that because of his depression, he only showered once each week, struggled with sleeping due to racing thoughts, and that he typically slept for four hours each night and required trazodone to help him sleep. (ECF No. 12, PageID.524-525). However, the ALJ found that "the objective medical evidence of record indicates greater physical and mental functioning than described in the hearing testimony." (*Id.*, PageID.486). For instance, she explained that "[t]he claimant consistently denied suicidal ideations during four years of mental health treatment appointments, and treating sources observed normal grooming and hygiene in the claimant." (*Id.*, PageID.490). She also noted that "most treatment notes reveal intact cognition, pleasant and cooperative behavior, normal speech, normal psychomotor activity, and attentiveness at therapy appointments." (*Id.*, PageID.489-490). Thus, contrary to Anthony's argument, the ALJ adequately considered Anthony's subjective symptoms and thoroughly explained where these symptoms were contradicted by the objective medical evidence.

## C.    In Sum

The medical evidence and opinions from mental health practitioners clearly establish that Anthony suffers from some degree of impairment from a neurodevelopmental disorder. Nonetheless, because the non-disability determination was adequately explained and well within the "zone of choice"

27

accorded to the fact-finder at the administrative hearing level, it should not be

disturbed by this Court. *Blakley, supra,* 581 F.3d at 406.

VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's motion be GRANTED, Anthony's motion be DENIED, and that

under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be

AFFIRMED.


Dated: August 10, 2022                s/Kimberly G. Altman
Detroit, Michigan                      KIMBERLY G. ALTMAN
                                  United States Magistrate Judge

**<u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>**

The parties to this action may object to and seek review of this Report and

Recommendation. Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

28

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 10, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager